UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LUIS SANCHEZ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| CDM SMITH, INC., and | § | |
| JACOBS ENGINEERING GROUP, INC. | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Luis Sanchez, complaining of Defendants, CDM Smith, Inc., and Jacobs Engineering Group, Inc., and for cause of action would show the Court as follows:

**I.**

**PARTIES**

1. Plaintiff Luis Sanchez ("Sanchez" or "Plaintiff") is an individual who resides in Sachse, Collin County, Texas.

2. Defendant CDM Smith, Inc., ("CDM" or "Defendant") a corporation with its principal office in Boston, Suffolk County, Massachusetts. CDM may be served with process through its registered agent for service of process, CT Corporation System, 1999 Bryan St. Suite 900, Dallas, Texas 75201-3136.

3. Defendant Jacobs Engineering Group, Inc., ("Jacobs" or "Defendant") a corporation organized under Texas law with its principal place of business in Dallas County, Texas.

Jacobs may be served with process through its registered agent for service of process CT Corporation System, 1999 Bryan St. Suite 900, Dallas, Texas 75201-3136.

## II.

## JURISDICTION

4. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331.

## III.

## VENUE

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Dallas County, Texas and because one of the Defendants is based in Dallas County.

## IV.

## EXHUSTION OF ADMINSTRATIVE REMEDIES

6. Plaintiff fully exhausted his administrative remedies and has fulfilled all jurisdictional prerequisites to filing his claims.  Plaintiff filed an employment discrimination charge against Defendants with the EEOC on October 9, 2020, the EEOC issued a Notice of Right to Sue.  Plaintiff filed this pleading within 90 days from his receipt of such notice.

## V.

## FACTS

7. Sanchez is a Cuban American of Hispanic descent.

8. He was hired by CDM as a Federal Emergency Specialist-Mid on June 7, 2019.

9. Sanchez brought CDM almost thirteen years of FEMA emergency experience.  He joined the Roads and Bridges Field Inspection Group in St. Croix on assignment.  The offer letter and memorandum of understanding specifically identified Sanchez would be a non-exempt

employee under the terms of the FLSA and he would receive payment for overtime at 1.5 times his hourly rate.

10. Sanchez was assigned by CDM to work on FEMA projects as a part of the CCPRS joint venture. CCPRS is a joint venture between CDM and Jacobs in order to provide engineering, architectural, and other related professional engineering services to assist state and local municipalities in developing grant applications for federal public assistance following any nationally declared disaster. In that capacity, Sanchez was directed, supervised and received performance reviews by employees of both CDM and Jacobs.

11. On August 3, 2019 Sanchez was re-deployed to Puerto Rico ("PR") and received his mobilization authorization. He did not receive a new offer letter or Memorandum of Understanding. On that same date, Sanchez emailed Jennifer Petruccelli ("Petruccelli"), a CDM Principal and FEMA Resource Coordinator and asked her to confirm how he would be paid for overtime. Petruccelli called Sanchez in response to his email and assured him that he would continue to be paid overtime in the same manner as he was paid in St. Croix.

12. Sanchez was never paid time and half for his overtime work in PR. FEMA sent weekly reports detailing how many hours each project employee was required to work that week. During portions of his PR assignment, Sanchez worked eight to ten hours of overtime a week and some weeks he worked more. When he realized he was not getting paid time and a half for this overtime work, Sanchez tried to call Petruccelli again to discuss why the pay was different than she promised. Petruccelli never returned Sanchez's voice mail regarding the lack of overtime pay.

13. Jacobs employee and co-leader of Sanchez's assignment, Ron Terrell ("Terrell"), a white male, yelled at Sanchez across a room full of people that he needed to talk to him. Sanchez

followed Terrell to the lunchroom, but Sanchez told Terrell he was not comfortable talking in front of all the people in the lunchroom, so they made their way outside. Once they got outside, Terrell chastised Sanchez for complaining to the CCPRS staff about problems with the Everbridge application, a system that Jacobs and CDM employees used to provide daily check-ins. Sanchez reminded Terrell that he was not the only employee complaining about the problems with the system and Terrell responded by telling Sanchez "well you are no princess either." This comment was made in front of Principal Senior Project Manager and Quality Manger Luis Jimenez ("Jimenez") a Puerto Rican male.

14. Following this interaction, Terrell always treated Sanchez in a negative and demeaning manner. Terrell would often ignore Sanchez and other minority employees and only speak to or interact with Caucasian employees. If Terrell did talk to Sanchez, he was rude, bullying and dismissive. Terrell was also rude and demeaning to female employees.

15. Sometime in September 2019, approximately fifteen employees complained to CCPRS leadership regarding the poor-quality chairs in the office and requested better chairs. CCPRS promised to provide better chairs. Seven weeks went by and the chairs were not provided. Sanchez eventually provided the TAC-Coordinator and CDM employee Jacqueline Nesir ("Nesir"), a white female, a doctor's note from a doctor in PR requiring a better office chair as a medical accommodation. Sanchez followed up numerous times, but no chair was provided. During the same time-period Shawn Zapalac ("Zapalac"), a Caucasian CDM employee deployed to PR, was given a better desk chair as an accommodation.

16. Throughout the fall of 2019, Sanchez complained to Nesir on multiple occasions about:

- his failure to receive overtime pay;

- CCPRS' inability to provide him a better chair when they had provided a better chair to a Caucasian employee;
- Terrell's princess comment,
- Terrell's discriminatory, inappropriate, and bullying conduct; and
- the fact that Terrell would often threaten Sanchez and other employees by saying if you don't like it you don't have to be here.

Nesir promised to escalate Sanchez's complaints to CCPRS and CDM to resolve. Sanchez never received any resolution following this escalation.

17. On November 22, 2019 Sanchez complained to Principal Senior HR Business Partner, Kristy Hermes ("Hermes"), a white female, regarding the fact that he was no longer paid overtime after he was transferred to PR. On December 3, 2019, Hermes responded and explained that when Sanchez was assigned to PR his job title changed from Construction Specialist to Construction Manager in order to match the labor categories in the FEMA contract and that his new position of Construction Manager was considered non-exempt.

18. Regardless of Sanchez's job title he did not perform any managerial or professional duties sufficient to justify the exempt status. Despite Sanchez's multiple complaints to CDM and Jacobs management and CDM HR, nobody analyzed Sanchez's job duties to determine if his exempt status was accurate.

19. In Mid-December, CDM and Jacobs sent Sanchez and many of the PR deployed employees home to work remotely. Sanchez was scheduled to be on rotation home and was told he could take a couple of extra days off to set up his home office. Unfortunately, CDM continued to require all of their employees assigned to PR to report in twice daily, even when they were home.

20. First, every employee was required to check-in with their Task Force Leader. Additionally, they were required to answer a daily phone call from the Everbridge system. Since Sanchez lived in Texas, he was forced to answer check in phone calls at 4:00 a.m. On December

12, Sanchez complained to his management team regarding the fact that he was receiving these phone calls and that he would be leaving for home on that day and was scheduled not to work the next week. Sanchez asked to be removed from the automated call system as he was flying home and attending his wife after surgery and requested to be excused from the calls while at home on his personal time.

21. On December 13[1], Terrell told Sanchez that he "will have to continue accountability via Everbridge." Later in the day, Terrell accused Sanchez of refusing to check in with his TAC- Coordinator. Sanchez responded and explained that he was just asking for better coordination and if they had to check-in during their days off for the time to be more reasonable.

22. On December 14, Sanchez complained after receiving another 4:00 a.m. phone call and asked that the calls be rescheduled. Terrell responded to this email and said, "can't you turn off your phone?" This response was very concerning since the police were called when Sanchez did not answer the phone on December 12 and Terrell had informed Sanchez that he would be required to continue to respond to the Everbridge calls.

23. On December 14, Sanchez complained to his previous boss, Jimenez and Hermes regarding Terrell's discriminatory and retaliatory treatment and the fact that he treated white employees better than minority employees. He specifically complained about the fact that Zapalac was treated better than minority employees because he was provided a better chair and that two white employees, James Blount and Anthony Cala, were not sent home and were allowed to continue working in PR earning per diem pay. Sanchez also complained

---

[1] Sanchez's new manager, Sr. Project Manager and CCPRS Deputy TOM, Jose Arsuaga ("Arsuaga") and TOM-CRC, Jacobs employee Javier Rivera ("Rivera"), a Puerto Rican male, were copied on many of Sanchez's complaint emails throughout December.

that Terrell was bullying and threatening and ignored and did not speak to Sanchez and Elijah Nevett, an African American employee. Although Jimenez did respond to Sanchez's December 14 email, he did not address any of Sanchez's complaints and ignored Sanchez's December 16 request to schedule a phone call to discuss further.

24. Following this email Hermes and Sanchez had a conversation where they went through Sanchez's specific complaints individually.

25. On December 16, Jacobs was able to update the Everbridge system to move Sanchez's robocall time to 6:00 a.m.

26. On December 22 and 24, 2019, Sanchez again complained regarding daily check-ins on his days off, failure to receive overtime pay, Terrell's retaliatory treatment and his continued threats of demobilization and CDM and Jacob's failure to provide him a chair per his doctor's accommodation request. This complaint was sent to Jimenez, Hermes and Sanchez's new boss, Senior Project Manager Jose Arsuaga-Morales.

27. Hermes set up a call to discuss Sanchez's complaints on approximately December 30. During this call Sanchez complained to Hermes about CDM's failure to pay overtime and their failure to provide him the same chair accommodations that were provided to a Caucasian employee. Hermes told Sanchez that his title did not qualify for overtime. Hermes promised to look into the chair. Sanchez also complained to Hermes about the on-going discrimination and retaliation. Hermes asked Sanchez if he had been interviewed as a part of another investigation of Terrell and Sanchez said he had not. Hermes indicated that there had been other complaints about Terrell including an anonymous complaint from a female employee who did not want to disclose her name because she was worried about termination because Terrell often threatened to terminate people.

28. On January 29, 2020, Sanchez submitted a second doctor's note requesting a better chair as a medical accommodation and CDM finally agreed to reimburse Sanchez for this expense.

29. On February 7, 2020, CCPRS Program Manager and Jacobs' employee Nannette Woods ("Woods"), a white female, sent a Program Manager Message on multiple topics including employee morale and concerns that project employees were not properly reporting overtime hours worked. Sanchez responded to Woods and reported Terrell's discriminatory actions.

30. On February 13, Woods responded and told Sanchez that they were aware of his complaints, had "conducted an internal investigation which produced some findings and action items which we are addressing." Following Sanchez's exchange with Woods, Hermes reached out to Sanchez and sat up a phone call to discuss his on-going complaints. Sanchez followed up with Hermes and reported the racial and retaliatory treatment of Terrell. Sanchez requested a status of the investigation and reported to Hermes that nobody had ever contacted him.

31. On April 10, 2020, Sanchez complained to Arsuaga, Rivera and Hermes regarding CCPRS's failure to timely approve his request for time off to attend Good Friday Mass with his family. Sanchez complained that his requests are ignored and not responded to by CCPRS management which was different from his coworkers who received timely approval. Sanchez received no response to this email from Arsuaga, Rivera or Hermes. On April 12, Sanchez followed up with Hermes and requested a call to discuss his failure to receive timely approval to attend mass due to CCPRs' retaliation.

32. In response to Sanchez's request, Hermes scheduled a call on April 20 with Arsuaga and Desiree Joseph.  Rather than addressing Sanchez's complaints regarding on-going retaliation and the missed holiday with his family, the call reviewed policy and procedures and accused Sanchez of unsubstantiated performance issues.  During the call, Sanchez was treated in a demeaning and dismissive manner.

33. Following this call, Sanchez sent Hermes an email requesting to schedule a call to talk about his next steps.  Sanchez complained that Arsuaga's complaints about his work were unfounded and that Arsuaga had no basis to criticize his work because he had been non-communicative since he entered the role and had no visibility of Sanchez's work.

34. On April 21, Arsuaga responded to an email Sanchez sent and accused him of "addressing the management team with a tone and attitude not professional, disrespectful, sarcastic and offensive."  Sanchez forwarded the email to Hermes and requested to schedule a call to discuss.  Hermes did not respond.  On April 24, Sanchez followed-up with Hermes to ask a status of the notes promised from their April 20 phone call and the scheduling of a call to address Arsuaga's email.  Hermes apologized for the delay and said she would respond as soon as she could.  Sanchez followed up again on April 27 and also responded directly to Arsuaga explaining that he found his April 21 accusations to be false and that they created an environment that was  "unbearable, uncomfortable and unproductive and has now gone to a personal level of harassment."

35. On April 23, Sanchez submitted his self-evaluation per the deadline established by CCPRS.  In that evaluation, Sanchez complained regarding Arsuaga's lack of responsiveness and failure to timely respond to emails.  Although Jacobs' employee Rivera supposedly reviewed, Sanchez on April 23, Sanchez did not receive the review until June 19, 2020

(after his demobilization). Rivera gave Sanchez a retaliatory poor review. However, Sanchez's production and the review received by FEMA establish that Sanchez's performance was satisfactory with above average productivity.

36. During the first week of May, Sanchez communicated with CCPRS regarding his need to schedule time off for medical reasons. He originally requested off May 7 and 8 for medical appointments, but then he was hospitalized and was forced to take the week of May 4 off. Sanchez also informed CCPRS that he would require a surgery in three weeks but would return to work on May 11. He also told them that he thought he would only require a couple of days off in relation to the surgery.

37. On May 21, 2020, Hermes changed Sanchez's manager away from Arsuaga because "the current manager/employee relationship has not been productive."

38. On June 4, Sanchez submitted a request to take off the week of June 15 for the surgery. He warned CCPRS that he might require an additional week off but would not know until after the surgery.

39. On June 12, Sanchez received a call that he was being demobilized and removed from the PR project while he was at the hospital preparing for his surgery. Upon information and belief, out of six Quality Assurance Managers assigned to PR, four were demobilized. Each of the demobilized Quality Assurance Managers were of Hispanic or African American descent and the two managers not demobilized were Caucasian. Additionally, Sanchez completed over three hundred more application submittals than Anthony Cala, a Caucasian employee retained by CDM. Additionally, CDM advertised to fill Sanchez's position on July 24, 2020.

40. CDM admitted that the demobilization was because of lack of work and not related to Covid-19.

41. Following Sanchez's demobilization, he complained about CDM's discriminatory and retaliatory treatment and on-going failure to pay overtime to Hermes on June 12 and to CDM Principal Senior Manager of Employee Relations, Janna Runyon, a white female, on June 26 and 27 and July 9.

42. Under the terms of the demobilization, Sanchez was placed on a short-term furlough without pay and allowed to file for unemployment. He would remain on short-term furlough without pay for six months and then be terminated, unless CDM chose to redeploy him to another assignment. During the time Sanchez was on short-term furlough with CDM, he would not be eligible to work for other FEMA contractors unless CDM released his FEMA Contractor badge.

43. Upon information and belief, the other CDM employees assigned to PR who were demobilized at the same time as Sanchez were redeployed to other assignments prior to July 9, 2020. On July 9, 2020, Sanchez complained to CDM about the fact that he was not re-deployed after lodging complaints of discrimination and retaliation and that he felt this was an additional form of retaliation.

44. During June and July, Sanchez applied for positions with other FEMA contractors, including Jacobs. Sanchez was told by Jacobs and other contractors that they were not interested in hiring him as long as his badge was assigned to CDM.

45. Realizing that CDM was not going to redeploy him, Sanchez asked that CDM release his FEMA contractor badge, in the hope that he would be able to find employment with other FEMA contractors.

46. On December 17, 2020, CDM sent Sanchez a letter stating that after reviewing his former job title with the Department of Labor, they determined that they had misclassified him as an exempt employee.  CDM admitted that Sanchez's work on the FEMA Public Assistance Technical Assistance III and IV contracts should have been classified as non-exempt and they paid his unpaid overtime wages.

47. Upon information and belief, each Defendant employed more than one thousand employees at all relevant times.

## VI.

## CAUSE OF ACTION

### Count One – FLSA Retaliation Under 29 U.S.C. § 215(a)(3) against both Defendants

48. Plaintiff incorporates Paragraphs 7 – 47 as though fully set forth herein.

49. At all times material to this action Defendants were "employers" as defined by 29 USC § 203.  Defendants are therefore subject to the provisions of the Fair Labor Standards Act.

50. Sanchez complained to CDM and Jacobs about their failure to pay him overtime on multiple occasions.  These complaints qualify as protected conduct under the FLSA.

51. These complaints were reasonable based upon the fact that CDM and the DOL later determined that Sanchez was misclassified and should have been paid overtime.

52. Following these complaints, Sanchez began to be treated less favorably in the terms and conditions of his employment then his co-workers who had not complained.  It is of violation the FLSA for *any person* to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act or has testified or is

about to testify in any such proceeding or has served or is about to serve on an industry committee." 29 USC § 215(a)(3).

53. Defendants took adverse employment actions against Sanchez by:

- failing to provide him the same chair accommodation they provided Caucasian employees;
- by sending Sanchez to work from home, eliminating the per diem benefit received by the employees that were allowed to keep working in PR;
- by providing him a negative performance review;
- by demobilizing Sanchez from the PR project; and
- not re-assigning him to another project.

Defendants took such adverse action because of Plaintiff's complaints about his failure to receive over-time pay.

54. Under the Fair Labor Standards Act, it is unlawful for an employer to retaliate against any individual because he has opposed any practice made unlawful by the statute. By taking the above-described adverse actions against Plaintiff in response to his opposition to his failure to receive overtime pay, Defendants engaged in unlawful retaliation in violation of the Fair Labor Standards Act.

55. Defendants are both liable to Plaintiff as joint employers/ single enterprise.

**Count Two- Americans with Disability Act – Disability against both Defendants**

56. Plaintiff incorporates Paragraphs 7 – 47 as though fully set forth herein.

57. At all times material to this action Defendants were "employers" as defined by 42 USC § 12111(5)(A). Defendants are therefore subject to the provisions of the Americans with Disabilities Act.

58. Plaintiff had a back condition which limited his ability to sit and work within the meaning of 42 USC § 12102.  Plaintiff also was diagnosed with colon cancer in May of 2020 and requested time off work for surgery and treatment.

59. He was qualified for his position as indicated by his thirteen years of experience working on FEMA projects and his meets expectations review from FEMA in 2020.

60. Defendants took adverse action against Sanchez when they demobilized him from the PR project and failed to redeploy him to another project.

61. Defendants took such adverse action because of Plaintiff's disability and requests for accommodation.

62. Defendants are both liable to Plaintiff as joint employers.

### Count Three–Americans with Disability Act – Failure to accommodate against both Defendants

63. Plaintiff incorporates Paragraphs 7 – 47 as though fully set forth herein.

64. At all times material to this action Defendants were "employers" as defined by 42 USC § 12111(5)(A).  Defendants are therefore subject to the provisions of the Americans with Disabilities Act.

65. Plaintiff's back condition limited his ability to sit for long periods of time within the meaning of 42 USC § 12102. Plaintiff's cancer limited his ability to work during surgery and treatment.

66. He was qualified for his position as indicated by his thirteen years of experience working on FEMA projects and his meets expectations review from FEMA in 2020.  He could have continued working with accommodations of the chair ordered by his doctor and medical leave for his cancer surgery and treatment.

67. Defendants failed to accommodate Plaintiff or to engage in the interactive process.

68. Defendants are both liable to Plaintiff as joint employers.

### Count Four- Americans with Disabilities Act- Retaliation against CDM

69. Plaintiff incorporates Paragraphs 7 – 47 as though fully set forth herein.

70. At all times material to this action Defendant CDM was an "employer" as defined by 42 USC § 12111(5)(A). CDM is therefore subject to the provisions of the Americans with Disabilities Act.

71. Plaintiff engaged in protected conduct as defined when he complained to multiple CDM managers and human resource personnel regarding the failure to accommodate his disability and opposed disability discrimination by complaining about his discriminatory treatment, failure to receive approval for a chair and his demobilization prior to his surgery.

72. He was qualified for his position as indicated by his thirteen years of experience working on FEMA projects and his meets expectations review from FEMA in 2020.

73. By demobilizing Plaintiff from the PR project and failing to re-assign him to another project, CDM took adverse actions against him. CDM took such adverse actions in retaliation for Plaintiff's protected conduct in complaining about discriminatory treatment and failure to accommodate.

### Count Five – Title VII and 42 U.S.C. §1981 Race Discrimination
### Against both Defendants

74. Plaintiff incorporates by reference paragraphs 7-47, as though fully set forth herein.

75. At all times material to this action Defendants were "employers" as defined by 42 USC § 2000 b.  Defendants are therefore subject to the provisions of Title VII and  42 USC § 1981.

76. Plaintiff was qualified for his position as indicated by his thirteen years of experience working on FEMA projects and his meets expectations review from FEMA in 2020.

77. Jacobs employee Terrell was Sanchez's supervisor. Terrell engaged in racially harassing and discriminatory conduct against Sanchez. In that Terrell called Sanchez derogatory names, treated him differently than Caucasian employees and constantly threatened to demobilize him from the project. Terrell engaged in this conduct because of Sanchez's national origin/race, Cuban/Hispanic. The conduct was severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

78. Additionally, Defendants took adverse employment actions against Sanchez by:

    - failing to provide him the same chair accommodation they provided Caucasian employees;
    - by sending Sanchez and other non-white employees to work from home, eliminating the per diem benefit received by the Caucasian employees that were allowed to keep working in PR;
    - by providing him a negative performance review;
    - by demobilizing Sanchez from the PR project; and
    - not re-assigning him to another project.

    Defendants took such adverse action because of Plaintiff's national origin/race, Cuban/Hispanic.

79. Through Defendants' supervisors, and/or employees, in a continuing course of conduct, Plaintiff was subjected to negative treatment and was terminated because of his national origin/race, Cuban/Hispanic.

80. Defendants' actions, as described herein, constitute unlawful discrimination on the basis of Plaintiff's race/national origin, in violation of Title VII and 42 U.S.C. § 1981.

81. Defendants are both liable to Plaintiff as joint employers/ single enterprise.

### Count Six – Title VII and 42 U.S.C. § 1981 Retaliation
### Against both Defendants

82. Plaintiff incorporates by reference paragraphs 7-47, as though fully set forth herein.

83. At all times material to this action Defendants were an "employer" as defined by 42 USC § 2000 b. Defendants are therefore subject to the provisions of Title VII and 42 USC § 1981.

84. Plaintiff was qualified for his position as indicated by his thirteen years of experience working on FEMA projects and his meets expectations review from FEMA in 2020.

85. Plaintiff engaged in protected conduct by making multiple complaints to CDM and Jacobs management and CDM human resources.

86. Defendants took adverse employment actions against Sanchez by:

- failing to provide him the same chair accommodation they provided Caucasian employees;
- by sending Sanchez and other non-white employees to work from home, eliminating the per diem benefit received by the Caucasian employees that were allowed to keep working in PR;
- by providing him a negative performance review;
- by demobilizing Sanchez from the PR project; and
- not re-assigning him to another project.

Defendants took such adverse action because of Plaintiff's protected conduct.

87. Under Title VII and 42 U.S.C. § 1981, it is unlawful for an employer to retaliate against any individual because he has opposed any practice made unlawful by the statute. By taking the above-described adverse actions against Plaintiff in response to his opposition to race/national origin discrimination, Defendants engaged in unlawful retaliation in violation of Title VII and 42 U.S.C. § 1981.

88. Defendants are both liable to Plaintiff as joint employers/ single enterprise.

## VII.

## PRAYER

89. Plaintiff respectfully requests that this Court grant the following relief from Defendants:

   A. A declaratory judgment, declaring Defendants' past practices herein complained of to be unlawful;

   B. Back pay, front pay, per diem pay, pension benefits, stock options, bonuses, health benefits, and any other relief necessary to compensate Plaintiff;

   C. Punitive and Liquidated damages;

   D. Damages for emotional distress and mental anguish;

   E. Prejudgment and post-judgment interest;

   F. Attorney's fees necessary for prosecution of Plaintiff's claims;

   G. Costs for the prosecution of Plaintiff's claims, including the costs of expert witness fees; and

   H. Such other general relief to which Plaintiff shows himself justly entitled.

## VII.

## JURY DEMAND

90. Plaintiff requests that all ultimate fact issues be submitted to a jury for determination. He has paid the jury fee.

Respectfully Submitted,

_____
Jane Legler
Texas Bar No. 03565820
Christine Neill
Texas Bar No. 00796793
Kyla Gail Cole
Texas Bar No. 24033113

Neill Legler Cole PLLC
3141 Hood Street, Ste. 200
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (facsimiles)
christine@nlcemployeelaw.com
jane@nlcemployeelaw.com
kyla@nlcemployeelaw.com